IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY, TENNESSEE, | ) ) ) | |
| | ) | NO. 3:25-cv-00643 |
| Plaintiff, | ) | |
| | ) | JUDGE RICHARDSON |
| v. | ) | |
| | ) | |
| YOUTH OPPORTUNITY INVESTMENTS, LLC, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Pending before the Court are two motions to dismiss. (Doc. Nos. 15, 35, "Motions"). The first (Doc. No. 15, "First Motion to Dismiss") was filed by both Defendants, Youth Opportunities of America, LLC ("YOA") and Youth Opportunity Investments, LLC ("YOI"). Via the First Motion to Dismiss, Defendants seek the dismissal of this action in its entirety pursuant to Rule 12(b)(6). The First Motion to Dismiss is supported by a memorandum (Doc. No. 16). Plaintiff, the Metropolitan Government of Nashville & Davidson County, Tennessee, has filed a response (Doc. No. 29) in opposition to the First Motion to Dismiss. Defendants have filed a reply (Doc. No. 33) in further support of the First Motion to Dismiss.

The second motion to dismiss (Doc. No. 35, "Second Motion to Dismiss") was filed by YOI (and not also YOA). Via the Second Motion to Dismiss, YOI moves for the dismissal—on grounds not raised in the First Motion to Dismiss—of Plaintiff's claim for breach of contract

insofar as that claim is brought against YOI. (Doc. No. 35 at 2).[1] Plaintiff has filed a response (Doc. No. 38) in opposition to the Second Motion to Dismiss. YOI has filed a reply (Doc. No. 43) in further support of the Second Motion to Dismiss.

For the reasons stated herein, the First Motion to Dismiss (Doc. No. 15) will be **GRANTED** in part and **DENIED** in part and the Second Motion to Dismiss (Doc. No. 35) will be **DENIED**.

<u>BACKGROUND</u>

## 1. Procedural Background

Plaintiff initiated this action by filing a complaint (Doc. No. 1-1, "Original Complaint") in the Davidson County Chancery Court. This action was then removed from the Davidson County

---

[1] Plaintiff also brought its claim for breach of contract against YOA, but the Second Motion to Dismiss seeks solely the dismissal of the breach of contract claim to the extent the claim is brought against *YOI*.

The Court notes that YOI did not separately file a memorandum of law in support of the Second Motion to Dismiss, choosing instead to incorporate its memorandum of law in support of the Second Motion to Dismiss within the Second Motion to Dismiss. Such a decision is permissible under the Local Rules. Local Rule 7.01(a)(2) ("Every motion requiring a determination of law must be accompanied by a memorandum of law . . .. The memorandum may be separately filed from the motion or may be incorporated with the motion.").

Also in the Second Motion to Dismiss, YOI purports to "incorporate[] by reference pursuant to Fed. R. Civ. P.10(c) the papers previously filed in support of the [First] Motion to Dismiss." (Doc. No. 35 at 2). Notably, Rule 10(c) provides that "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion." Fed. R. Civ. P. 10(c). Of course, a motion is not a pleading, and the narrowly tailored provisions of Rule 10(c) that allow adoption by reference of a pleading's specific allegations do not allow for a general adoption in one motion of arguments made in support of a different motion. *See Marco Int'l, LLC v. Como-Coffee, LLC*, No. 17-CV-10502, 2018 WL 1790171, at *1 n.1 (E.D. Mich. Apr. 16, 2018) ("Rule 10(c) merely provides that a statement made in a pleading may be adopted by reference elsewhere . . . Documents that constitute 'pleadings' are specifically enumerated in Fed. R. Civ. P. 7(a), and a motion (or a response to a motion) is not a pleading."). Nevertheless, given the lack of objection from Plaintiff to YOI's purported incorporation, and because "[a] few federal courts have allowed defendants to incorporate by reference prior motions made in the action, even though Rule 10(c) does not contemplate the incorporation of statements from prior motions (only statements 'in a pleading' may be adopted by reference elsewhere)," Wright and Miller, 5A Fed. Prac. & Proc. Civ. § 1326 (4th ed.) (footnote omitted), the Court will treat the Second Motion to Dismiss as if it had in fact incorporated the papers filed in support of the First Motion to Dismiss.

Chancery Court to this Court on June 10, 2025 (Doc. No. 1). On August 8, 2025, Defendants filed the First Motion to Dismiss, and on September 26, 2025, YOI filed the Second Motion to Dismiss.

After Defendants filed the First Motion to Dismiss (but prior to the filing of the Second Motion to Dismiss), Defendants filed a motion to strike (Doc. No. 17, "Motion to Strike"), therein requesting that the Court "strike the second grammatical sentence of Paragraph 28 of the Complaint." (Doc. No. 17 at 1). On March 11, 2026, the Magistrate Judge granted the Motion to Strike, ordered Plaintiff to "refile the [Original] Complaint excluding the second grammatical sentence of paragraph 28 [of the Original Complaint]," and directed the Clerk to place under seal the Original Complaint. (Doc. No. 45 at 5). Plaintiff subsequently filed a revised version of the complaint (Doc. No. 47, "Revised Complaint"), which removed the second grammatical sentence of Paragraph 28 of the Original Complaint. In all other respects, the Revised Complaint appears to be identical to the Original Complaint.[2]

The Court next sets forth allegations in the Revised Complaint.

---

[2] Given these circumstances, the Court treats the Revised Complaint as the operative complaint in this action and will cite and rely on the Revised Complaint throughout this Memorandum Opinion. The Court will also discuss the Motions (and the briefing made thereto) as if they addressed the Revised Complaint, rather than the Original Complaint, even if in actuality the Motions were made requesting the dismissal of all or a part of the Original Complaint and the Motions (and the briefing thereto) referenced and discussed specifically the Original Complaint.

Of note, the Original Complaint and the Revised Complaint are supported by five exhibits, which are filed at Docket Nos. 25-1 – 25-5. It appears to the Court that these exhibits are filed at Docket Nos. 25-1 – 25-5—rather than, for example, as attachments to the Original Complaint (Doc. No. 1-1)—because, as Plaintiff explained in its Notice of Filing (Doc. No. 25), wherein Plaintiff gave notice of the filing of the exhibits at Docket Nos. 25-1 – 25-5, "[w]hen Defendants removed the case to federal court (Doc. No. 1) the [Original] Complaint was attached (Doc. No. 1-1) [to the Notice of Removal (Doc. No. 1)] but the filing did not include the [Original] Complaint's exhibits." (Doc. No. 25 at 1). Given these circumstances, the Court will treat these exhibits as if they had been attached to both the Original Complaint and Revised Complaint as filed on this Court's docket.

As will be detailed further in a footnote below, the Court may consider these exhibits—or at least portions of these particular exhibits—in its adjudication of the Motions.

### 2. Alleged Facts[3]

a. <u>The Parties</u>

Plaintiff "is an incorporated legal subdivision of the State of Tennessee." (Doc. No. 47 at ¶ 1).

Defendant YOI "is a limited liability [company] organized under the laws of Indiana and authorized to do business in the State of Tennessee." (*Id.* at ¶ 2). YOI "owns and operates clinical treatment centers for minors." (*Id.* at ¶ 6).

YOI's sole co-defendant, YOA, "is a limited liability [company] organized under the laws of Indiana. YOA was formerly registered to do business in the State of Tennessee, but its status as a foreign limited liability [company] has been revoked." (*Id.* at ¶ 3).[4] [5]

b. <u>The YOI Agreement</u>

In 2015, "YOI entered into a competitive bidding process for a Metropolitan Government contract for juvenile justice facility management services." (Doc. No. 47 at ¶ 7). "YOI was

---

[3] The facts herein are taken from the Revised Complaint. For purposes of the instant Motion, the facts in the Revised Complaint are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

[4] The Revised Complaint suggests, but does not allege outright, that YOA is a sister company of YOI. (Doc. No. 47 at 2).

[5] In the Revised Complaint, Plaintiff refers to both YOI and YOA as limited liability *corporations* organized under the laws of Indiana. However, it appears that there is no such thing as a limited liability *corporation* under Indiana law. Instead, the Court discerns that YOI and YOA are actually limited liability *companies*, which is a particular type of business entity contemplated by Indiana law. *See* IN Code § 23-18-1-1 *et seq.* (Indiana statutory scheme governing limited liability *companies*). Likewise, Plaintiff refers to YOA as a foreign limited liability *corporation* registered to do business in Tennessee, but Tennessee law does not contemplate an entity called a foreign limited liability *corporation*. Instead, the Court discerns that YOA was actually operating as a foreign limited liability *company*, which is a particular type of business entity contemplated by Tennessee law. *See* T.C.A. § 48-249-901 *et seq.* (Tennessee statutory scheme governing foreign limited liability *companies*).

awarded the contract and entered into an agreement with [Plaintiff] in 2016 to manage a juvenile detention facility in Davidson County, Tennessee. YOI provided services under that contract"—which is not one of the contracts at issue in this case—"from 2016 to 2021." (*Id.*).

In 2020, "YOI again entered into a competitive bidding process for [a] contract for juvenile justice facility management services," and on "December 1, 2020, YOI was notified that it was selected for the contract, subject to successful negotiations." (*Id.* at ¶ 8). Subsequently, YOI entered into an agreement (the "YOI Agreement")[6] with Plaintiff, wherein YOI agreed to provide services for and to manage the Davidson County Juvenile Detention Center ("DCJDC"). (*Id.* at ¶¶ 9-10).[7] The YOI Agreement "allowed for financial penalties if YOI failed to fulfill certain requirements [under the YOI Agreement]." (Doc. No. 47 at ¶ 11). The "effective date of the YOI Agreement was March 3, 2021," (*id.* at ¶ 12; Doc. No. 25-1 at 17), and the YOI Agreement's term was 60 months. (Doc. No. 47 at ¶ 13 (quoting Doc. No. 25-1 at 3)). The YOI Agreement had an estimated value of $28,000,000. (Doc. No. 47 at ¶ 13 (quoting Doc. No. 25-1 at 3)). Importantly, Section 8.22 of the YOI Agreement provided that the YOI Agreement may be assigned with the consent of Plaintiff, but that "[a]ny such assignment or transfer shall not release [YOI] from its obligations [under the YOI Agreement]." (Doc. No. 25-1 at 14).

### c. The Assignment and the YOA Agreement

On June 22, 2021, Gary Sallee ("Sallee"), who was—at least during the events described in the Revised Complaint—YOI's Chief Legal Officer, sent an email (the "Sallee Email")[8] to

---

[6] A copy of the YOI Agreement is filed at Docket No. 25-1.

[7] The Revised Complaint does not make it explicit that this was the particular facility that YOI agreed to manage. However, an exhibit (Doc. No. 25-3)—which, for reasons the Court discusses below, the Court can consider in evaluating the Motions—to the Revised Complaint makes this clear.

[8] A copy of the Sallee Email is filed at Docket No. 25-3.

Plaintiff, therein "requesting that the YOI Agreement be assigned to a [different] company, Youth Opportunities of America, LLC [(i.e., YOA)]." (Doc. No. 47 at ¶ 14).[9] In the Sallee Email, Sallee wrote:

> As I advised you [i.e., Plaintiff)] in our conversation, [YOI] is in the midst of refinancing its loan facilities with a health care lender that requires moving the contract for management of the [DCJDC] to a sister company (owned by the same partners as YOI), [YOA]. It will have the same address as YOI, the same owners, and the DCJDC will have the same employees, managers, etc. The only noticeable difference will be the check from [Plaintiff] will go to YOA instead of YOI.

(*Id.* at ¶ 15 (quoting Doc. No. 25-3) (emphasis omitted)). In obtaining Plaintiff's consent to the Assignment, YOI failed to disclose that "YOA [allegedly] lacked sufficient financial assets to complete [its contractual] obligations [to Plaintiff after the assignment of the YOI Agreement to YOA]." (Doc. No. 47 at ¶ 26). Indeed, YOA—in contrast to YOI, which "is a thriving business with numerous locations nationwide, and an estimated annual revenue of $300 million" (*id.* at ¶ 27)—allegedly "has and had virtually no assets or revenue." (*Id.* at ¶ 28). YOI intended to use the Assignment as a means "to extricate itself from the YOI Agreement and used the assignment to YOA in an effort to insulate YOI's assets from liability for [any] breach." (*Id.* at ¶ 25).[10]

---

[9] As relevant to the Assignment, the YOI Agreement states in Section 8.22, with the Term "Contractor" referring to YOI and the term "Metro" referring to Plaintiff:

> The provisions of this Contract shall inure to the benefit of and shall be binding upon the respective successors and assignees of the parties hereto. Except for the rights of money due to CONTRACTOR under this Contract, neither this Contract nor any of the rights and obligations of CONTRACTOR hereunder shall be assigned or transferred in whole or in part without the prior written consent of METRO. Any such assignment or transfer shall not release CONTRACTOR from its obligations hereunder.

(Doc. No. 25-1 at 14). So, even after the assignment of the YOI Agreement to YOA—which is discussed further below—under Section 8.22 of the YOI Agreement, YOI was still bound by (i.e., potentially liable for breach of) its contractual obligations to Plaintiff under the YOI Agreement.

[10] The Court notes that it uses the terms "allegedly" and "alleged" to qualify the particular allegations quoted in this paragraph because these allegations are conclusory allegations about YOA's financial health that are not supported elsewhere in the Revised Complaint by any factual matter. *See e.g., Wells v. Pohl*, No. 5:24-CV-00299-KKC, 2025 WL 2045170, at *2 (E.D. Ky. July 21, 2025) ("On a motion to dismiss, the Court

"Based upon YOI's representations" that the only notable difference after assignment of the YOI Agreement to YOA would be that the check from Plaintiff would go to YOA instead of YOI, "[Plaintiff] agreed to permit the assignment" of the YOI Agreement to YOA. (*Id.* at ¶ 17).[11] The Assignment was signed by Ronald D. Hunter ("Hunter"), who at all relevant times was the CEO of both YOI and YOA. (*Id.* at ¶ 18). Subsequently—and seemingly to specify the contractual obligations of YOA to Plaintiff after the assignment of the YOI Agreement to YOA—YOA and Plaintiff entered into the "Juvenile Detention Facility Operation and Management Services Agreement ("YOA Agreement") with an expected start date of August 3, 2021." (*Id.* at ¶ 19).[12]

"YOA performed under the YOA Agreement"—and thus managed DCJDC and otherwise provided services in connection with the management of DCJDC—"from August 2021 to May 2022." (Doc. No. 47 at ¶ 20). However, on May 6, 2022, YOA sent to Plaintiff a letter (the "Termination Letter"), in which YOA stated "that it was unilaterally terminating the [YOA Agreement] as of June 5, 2022." (*Id.* at ¶ 21).[13] YOA "subsequently agreed to continue to fulfill

---

does not accept as true 'conclusory allegations without specific facts.'" (quoting *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 817 (6th Cir. 2020))).

The Court is aware that sometimes the line between a mere "conclusory allegation" (which is *not* assumed to be true) and an allegation of factual matter (which *is* assumed to be true) is murky. The Court is constrained to consider the allegations here at issue mere conclusory allegations. First, the assertion that a party "lack[ed] sufficient financial assets" to satisfy particular obligations is not one of raw fact, but a mere conclusion that can be reached only by assessing underlying facts—namely, facts regarding what financial assets the party had and facts regarding what financial assets were required to satisfy the applicable obligations. Second, the allegation that a party "has and had virtually no assets or revenue" is again a mere conclusion that can be reached only by assessing underlying facts—namely, facts regarding what financial assets the party had and *when* the party had those particular financial assets.

[11] A copy of the assignment agreement (the "Assignment") is filed at Docket No. 25-4 at 2. Copies of other documents, seemingly related to the Assignment, are also in the filing at Docket No. 25-4.

[12] A copy of the YOA Agreement is filed at Docket No. 25-2. Notably, the Revised Complaint does not explicitly detail the precise relationship between the YOI Agreement, the YOA Agreement, and the Assignment.

[13] The Termination Letter was signed by Hunter. A copy of the Termination Letter is filed at Docket No. 25-5.

---

the [YOA] Agreement until July 1, 2022," however Plaintiff "was required to obtain an emergency contract for juvenile justice facility management services through another company," (*id.* at ¶ 23), thereby incurring monetary losses it would not have absent the termination of the YOA Agreement. (*Id.* at ¶¶ 29-36).[14]

## PLAINTIFF'S CLAIMS AND THE MOTIONS

Plaintiff brings two claims. The first (Count I) is a breach of contract claim against YOI and YOA. (Doc. No. 47 at ¶¶ 37-46). As far as the Court can tell from the Revised Complaint, via Count I Plaintiff asserts that (i) YOI breached the YOI Agreement by failing to carry out its contractual obligations to Plaintiff after the YOI Agreement was assigned to YOA[15] and (ii) YOA breached the YOA Agreement by terminating the YOA Agreement. The second (Count II) is a claim for fraudulent inducement against YOI. (Doc. No. 47 at ¶¶ 47-53). Via Count II, Plaintiff alleges that YOI fraudulently induced Plaintiff to consent to the assignment of the YOI Agreement to YOA. In particular, Plaintiff alleges that when "YOI requested [in the Sallee Email] that [Plaintiff] assign the [YOI] Agreement to YOA, YOI made false statements concerning facts material to the transaction." (*Id.* at ¶ 48).[16] Specifically, Plaintiff contends that the following

---

[14] Plaintiff specifically alleges that the amount of monetary damages it incurred as a result of the termination of the YOA Agreement (and the subsequent obtaining of an emergency contract) are $1,891,139. (Doc. No. 47 at ¶¶ 30, 31).

[15] The crux of YOI's (alleged) breach of the YOI Agreement would seem to be rooted in Section 8.22 of the YOI Agreement, which, as noted above, provides that "[a]ny such assignment or transfer [of the YOI Agreement] shall not release [YOI] from its obligations [under the YOI Agreement]." (Doc. No. 25-1 at 14). In other words, even though the YOI Agreement had been assigned to YOA, and YOA had subsequently negotiated the YOA Agreement with Plaintiff, YOI was not released from its obligations under the YOI Agreement. Given that YOA subsequently (allegedly) failed to perform its own contractual obligations to Plaintiff, YOI thus (allegedly) breached the YOI Agreement.

Ultimately, the Court need not precisely identify the particular *breach* that underlies the breach of contract claim against YOI, given that Defendants do not move to dismiss Count I to the extent it is brought against YOI based on any purported absence of allegations of a breach of the YOI Agreement by YOI.

[16] Although Plaintiff's allegation here suggests that *Plaintiff* was the party that assigned the YOI Agreement to YOA, that is not the case. Instead, and as other allegations in the Revised Complaint make clear, Plaintiff

statements ("At-Issue Statements") in the Sallee Email were false: "[YOA] will have the same address as YOI, the same owners, and the DCJDC will have the same employees, managers, etc. The only noticeable difference will be the check from [Plaintiff] will go to YOA instead of YOI" (*id.* (quoting Doc. No. 25-3)). (Doc. No. 47 at ¶ 48). Plaintiff further alleges that YOI knew that the At-Issue Statements were false and that "YOI had a duty not to mislead [Plaintiff] about YOA's ability to [carry out any contractual obligations to Plaintiff]." (*Id.* at ¶¶ 49, 51).

In their memorandum in support of the First Motion to Dismiss, Defendants contend, among other things, that: (1) Plaintiff has failed to plead fraudulent inducement with the requisite particularity under Rule 9(b) and has failed to state a claim for fraudulent inducement (Doc. No. 16 at 6-8); (2) the fraudulent inducement claim (and, relatedly, the breach of contract claim) is barred by the statute of limitations (*id.* at 9-15); (3) the fraudulent inducement claim should be dismissed because it is duplicative of the breach of contract claim (*id.* at 15-18); and (4) the breach of contract claim against YOA should be dismissed because the YOA Agreement is unenforceable.[17] (Doc. No. 16 at 18-24). YOI contends via the Second Motion to Dismiss that Plaintiff released YOI from any further obligations under the YOI Agreement and that therefore

---

"agreed *to permit* the assignment" of the YOI Agreement to YOA based upon "YOI's representations." (Doc. No. 47 at ¶ 17) (emphasis added). And as the Assignment itself makes clear, the Assignment was entered into between *YOI* and *YOA* (and Plaintiff was not a party to the Assignment itself). (Doc. No. 25-2 at 4).

[17] Although Defendants speak in terms of dismissal of *all* of Count I (which asserts claims against both YOI and YOA) based on the (asserted) unenforceability of the YOA Agreement (Doc. No. 16 at 18-24), the Court perceives that whether the YOA Agreement is enforceable goes solely towards the continued vitality of the breach of contract claim against *YOA*, given that YOI did not enter into the YOA Agreement. (Doc. No. 47 at ¶ 19; Doc. No. 25-2 at 17).

YOI seems to have gained this perception subsequently, given that it argues in the Second Motion to Dismiss that Plaintiff released YOI from any of its obligations under the YOI Agreement and that therefore (according to YOI) Plaintiff's breach of contract claim against YOI should be dismissed. (Doc. No. 35 at 2).

Plaintiff's breach of contract claim should be dismissed to the extent that it is brought against YOI. (Doc. No. 35 at 2).[18]

<u>LEGAL STANDARD</u>

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendants' liability do not satisfy

---

[18] In both the First Motion to Dismiss and the Second Motion to Dismiss, Defendants assert in two footnotes that YOA has not been served and that the filing of the Motions to Dismiss do not waive any of YOA's defenses based on deficiency of service of process. (Doc. No. 15 at 1 n.1; Doc. No. 35 at 1 n.1). Leaving aside whether it is proper for one defendant to assert a defense on behalf of another—as YOI has done in the Second Motion to Dismiss on behalf of YOA—raising an objection to deficient service in a "perfunctory fashion," as YOA has done in the First Motion to Dismiss, "will not do" to preserve that defense. *King v. Taylor*, 694 F.3d 650, 657 (6th Cir. 2012). And district courts frequently find that arguing in passing that service was improper (or not effectuated) constitutes a waiver of the defense of defective service. *Nimer v. Adam Tours of New York, Inc.*, No. 14-13689, 2021 WL 3912788, at *1 (E.D. Mich. Sept. 1, 2021). The Court does likewise here, finding that by raising a defense of lack of service in a passing and perfunctory manner, YOA has waived any defense as to deficient service on YOA.

the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

Under the Federal Rules of Civil Procedure, "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." However, there is an exception to this Rule: "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018). "It must also be clear that there exists no material disputed issues of fact regarding

the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (cleaned up and quotation omitted). "In other words, if the authenticity, validity, or enforceability of a document is not in dispute, the court may consider it on a motion to dismiss, but a genuine dispute as to the legal sufficiency of a document requires the court to consider the issue under a motion for summary judgment standard." *Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*, No. 3:17-CV-00643, 2018 WL 6181356, at *2 (M.D. Tenn. Nov. 27, 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 434 (6th Cir. 2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

DISCUSSION[19]

The Court will begin its analysis by reviewing the First Motion to Dismiss, before then turning to the Second Motion to Dismiss. In their memorandum in support of the First Motion to

---

[19] Before beginning its discussion, however, the Court notes that it discerns—and no party argues otherwise—that given that these documents are referred to in the Revised Complaint and are central to the claims therein, the Court may consider the YOI Agreement (Doc. No. 25-1), the YOA Agreement (Doc. No. 25-2), the Sallee Email (Doc. No. 25-3), the Assignment (Doc. No. 25-4 at 2), and the Termination Letter (Doc. No. 25-5) in evaluating the Motions without converting the Motions into motions for summary judgment.

 Importantly, and as the Court will discuss below, although the Court discerns that it may consider the Assignment (Doc. No. 25-4 at 2) in considering the Motions, the Court is not convinced that it can consider other documents aside from the Assignment that are also in the filing at Docket No. 25-4.

Dismiss, Defendants begin by arguing that Count II of Plaintiff's Revised Complaint should be dismissed, before then discussing Count I. Following the sequencing of Defendants' arguments in their memorandum in support of the First Motion to Dismiss, the Court will first examine whether Plaintiff's claim for fraudulent inducement in Count II should be dismissed. The Court will then turn to the arguments—raised via the First Motion to Dismiss by both Defendants and via the Second Motion to Dismiss by YOI alone—that the claim for breach of contract in Count I should be dismissed, either in part or in its entirety.

### 1. Count II: Fraudulent Inducement[20]

The parties agree that Tennessee law is the substantive law applicable to this action.[21] Under Tennessee law,[22] to state a claim for fraudulent inducement (or, as it is sometimes called,

---

[20] The Court is aware that Defendants argue that Plaintiff has not pled its fraudulent inducement claim in Count II with the required particularity under Rule 9(b). Rule 9(b) requires that a plaintiff "state with particularity the circumstances constituting fraud," which the Sixth Circuit has interpreted to mean that the plaintiff, at a minimum, must "allege the time, place, and content of the alleged misrepresentation . . . ; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993))). It is beyond dispute that Plaintiff's claim for fraudulent inducement in Count II is subject to Rule 9(b)'s particularity requirements. *See Thompson v. Bank of Am., N.A.,* 773 F.3d 741, 751 (6th Cir. 2014) (fraudulent inducement claim is subject to Rule 9(b)); *Wigley v. Am. Equity Mortg.*, No. 15-2473-STA-CGC, 2016 WL 866359, at *1 (W.D. Tenn. Mar. 3, 2016) (noting that plaintiff failed to state a claim for fraudulent inducement "with the particularity" required under Rule 9(b)); *Hinman v. Valleycrest Landscape Dev., Inc.*, No. 3:19-CV-00551, 2020 WL 434161, at *10 (M.D. Tenn. Jan. 28, 2020) (noting that a complaint "utterly fails to state a fraudulent inducement claim[], and certainly does not satisfy the Rule 9(b) standard."). But here, the Court need not decide whether Plaintiff has satisfied Rule 9(b)'s particularity requirements, because even assuming *arguendo* that Plaintiff has done so, Plaintiff has failed to state a claim for fraudulent inducement under Tennessee law.

[21] The Court notes that it is able to exercise subject-matter jurisdiction over this action only pursuant to 28 U.S.C. § 1332(a); that is, through diversity jurisdiction. (Doc. No. 1).

[22] The Court notes that in citing cases herein to identify or explain its view as to what Tennessee law is on a particular topic or issue, the Court is mindful of the so-called *Erie* doctrine, whereby the Court should not necessarily accept that a court's prior statement of Tennessee law accurately reflects current Tennessee law. (Notably, at times the Court cites cases that purport to state Tennessee law, but does so for some purpose other than to identify or explain *the Court's view* as to what current Tennessee law is—for example, in order to note a particular view of some aspect of Tennessee law that is held by some courts but not necessarily by other courts and not necessarily by the undersigned judge of this Court).

fraudulent inducement to contract or fraudulent misrepresentation in inducement of a contract), a

plaintiff must plausibly allege five elements: "(1) a false statement concerning a fact material to

the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to

induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right

to rely on the statement; [and] (5) an injury resulting from the reliance." *Lamb v. MegaFlight, Inc.*,

26 S.W.3d 627, 630 (Tenn. Ct. App. 2000).[23] As Tennessee state courts have observed, seemingly

---

The *Erie* doctrine was announced in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). "Under the *Erie* doctrine, a federal court sitting in diversity applies 'the substantive law of the forum state and federal procedural law.'" *Bonasera v. New River Elec. Corp.*, 518 F. Supp. 3d 1136, 1151 (S.D. Ohio 2021) (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)).
    The Sixth Circuit has explained:

> In diversity cases such as this, [the *Erie* doctrine requires that] we apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise."

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citations and footnote omitted) (quoting *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995)). Putting things somewhat differently, the Sixth Circuit recently has said:

> When applying state law, we must follow the controlling decision of the highest state court. If no such decision controls, we follow a decision of the state appellate court, published or unpublished, unless we are convinced that the highest court of the state would decide otherwise.

*Boyd v. N. Biomedical Rsch., Inc.*, 165 F.4th 424, 435 (6th Cir. 2026) (citations, quotation marks, and ellipsis omitted).
    Herein, when the Court cites a decision of the Tennessee Court of Appeals (or, for that matter, a decision of the Tennessee Supreme Court or a federal court) stating a purported proposition of Tennessee law, it does so with confidence that the Tennessee Supreme Court today would not decide differently with respect to the statement.

[23] Notably, this five-element test for fraudulent inducement has sometimes been stated in terms of six elements:

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when it was made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damages as a result of the misrepresentation.

(although they have not always stated this explicitly) in connection with the first element of a claim for fraudulent inducement—i.e., that a false statement need to have been made—"[c]laims for fraudulent [] inducement [] may involve either false statements of past or present facts or false promises made without the present intent to [carry out the promise]." *Butler v. Butler*, No. W200701257COAR3CV, 2008 WL 5396019, at *7 (Tenn. Ct. App. Dec. 23, 2008) (citing *Lowe v. Gulf Coast Dev. Inc.*, No. 01A01-9010-CH-00374, 1991 WL 220576, at *7 (Tenn. Ct. App. Nov. 1, 1991)). *See also Tullahoma Indus., LLC v. Navajo Air, LLC*, No. M201700109COAR3CV, 2018 WL 3752305, at *7 (Tenn. Ct. App. Aug. 7, 2018) ("At a minimum, the false statement element of a fraudulent inducement claim 'must embody a promise of future action without the present intention to carry out the promise.'" (quoting *Keith v. Murfreesboro Livestock Market, Inc.*, 780 S.W.2d 751, 754 (Tenn. Ct. App. 1989))).[24] In other words, a statement can satisfy the first element of a claim for fraudulent inducement if that statement is either a "false statement[] of

---

*McPherson v. William E. George, Inc.*, No. W200802450COAR3CV, 2010 WL 1565528, at *6 (Tenn. Ct. App. Apr. 20, 2010) (citing *Biancheri v. Johnson*, Nos. M2008–00599–COA–R3–CV & M2007–02861–COA–R3–CV, 2009 WL 723540, at *7 (Tenn. Ct. App. Mar. 18, 2009)). The Court has elected to utilize the five-element test quoted in the body of this Memorandum Opinion for two reasons. First, the parties have each recited the elements of fraudulent inducement in terms of this five-element test. And second, the Tennessee Supreme Court has frequently, and has fairly recently, recited the elements of fraudulent inducement in terms of the five elements repeated by the Court above. *See Baugh v. Novak*, 340 S.W.3d 372, 388 (Tenn. 2011).

[24] The Court is aware of the seeming conflict between the statement that "[c]laims for fraudulent [] inducement [] may involve either false statements of past or present facts or false promises made without the present intent to [carry out the promise]." *Butler*, 2008 WL 5396019, at *7, and the statement that "[a]t a minimum, the false statement element of a fraudulent inducement claim must embody a promise of future action without the present intention to carry out the promise," *Tullahoma Indus., LLC*, 2018 WL 3752305 (citation and internal quotation mark omitted), at *7, regarding whether a claim for fraudulent inducement can survive on the basis of an alleged false statement of past or present fact if there is not also an allegation of a false promise of future action without a present intent to carry out that promise. But the Court need not (and so does not) resolve this conflict herein given that the Court finds that Plaintiff has neither alleged a false statement of past or present fact nor a false promise made without present intent to carry out that promise.

past or present fact[] or [a] false promise[] made without the present intent to [carry out the promise]." *Butler*, 2008 WL 5396019, at \*7.

As suggested by the case law discussed in the preceding paragraph, when considering whether a statement satisfies the first element of a claim for fraudulent inducement, the falsity of a statement of past or present fact or promise is assessed at the time that the statement or promise *was made. Cf. Butler*, 2008 WL 5396019, at \*7 ("[c]laims for fraudulent [] inducement [] may involve either *false statements of past or present facts* or false promises made *without the present intent* to [carry out the promise]." (emphasis added)). Indeed, some formulations of the elements of a claim for fraudulent inducement specifically note the requirement that a statement be "false when it was made." *McPherson*, 2010 WL 1565528, at \*6.

Here, the parties' dispute as to whether Plaintiff has stated a claim for fraudulent inducement hinges on the first element[25] of a claim for fraudulent inducement, and in particular on whether Plaintiff has plausibly alleged that YOI (or more precisely, one of YOI's officers, Sallee) made a false statement.[26] Given this dispute, it is important to identify precisely the alleged

---

[25] Defendants also seem to make certain arguments as to whether Plaintiff has adequately pled the second element of fraudulent inducement (Doc. No. 16 at 8)—i.e., arguments as to whether Plaintiff has adequately alleged that Defendants had knowledge of the At-Issue Statements' falsity or utter disregard for their truth. In the event, the Court is able to conclude that Count II can be dismissed without an analysis of the second element of a fraudulent inducement claim and so the Court will not consider whether Plaintiff has adequately alleged the second element.

[26] Strictly speaking, the first element of a claim for fraudulent inducement involves a "*a false statement concerning a fact material to the transaction*." Here, Defendants' briefing as to whether Plaintiff's allegations satisfy the first element of a claim for fraudulent inducement does not actually substantively address whether any statement was or was not *material* to the transaction at issue with the claim for fraudulent inducement in Count II—i.e., the assignment of the YOI Agreement to YOA. Instead, the briefing on the First Motion to Dismiss focuses on whether any *false* statement was made in connection with that transaction. Thus, the Court focuses its analysis on whether any *false* statement was made in connection with that transaction and eschews any analysis of whether a particular statement was in fact *material* to that transaction.

 Additionally, the Court notes that although it has observed that a statement may satisfy the first element of a claim for fraudulent inducement if that statement is either a "false statement[] of past or present fact[] or [a] false promise[] made without the present intent to [carry out the promise]," *Butler*, 2008 WL 5396019,

false statement at issue here, and how this statement allegedly was false. As noted above, via Count II Plaintiff alleges that YOI fraudulently induced Plaintiff to consent to the assignment of the YOI Agreement to YOA. (Doc. No. 47 at ¶¶ 47-53). Specifically, Plaintiff alleges that when "YOI requested that [Plaintiff] assign the [YOI] Agreement to YOA [in the Sallee Email], YOI made false statements concerning facts material to the transaction." (*Id.* at ¶ 48).[27] In particular, Plaintiff contends that the "At-Issue Statements"—i.e., the statements in the Sallee Email that "[YOA] will have the same address as YOI, the same owners, [that] the DCJDC will have the same employees, managers, etc. [and that t]he only noticeable difference will be the check from [Plaintiff] will go to YOA instead of YOI" (*id.* (quoting Doc. No. 25-3)) were false when made. (Doc. No. 47 at ¶ 48). Plaintiff further alleges that YOI knew that the At-Issue Statements were false when made and that "YOI had a duty not to mislead [Plaintiff] about YOA's ability to [carry out any contractual obligations to Plaintiff]." (*Id.* at ¶¶ 49, 51). Put another way, and as Defendants state in their memorandum in support of the First Motion to Dismiss, Plaintiff's theory is that the At-Issue Statements were false when made because YOA "never had the ability to meet its financial obligations [under either the YOI Agreement, which was assigned to it, or the YOA Agreement subsequently negotiated] in the first place." (Doc. No. 16 at 7).

Faced with these allegations, Defendants contend in part—albeit in what is not Defendants' clearest argument—that Plaintiff has not pled sufficient factual matter to show that the At-Issue

---

at *7, for the sake of brevity the Court will sometimes use the shorthand of a statement simply being "false" in connection with whether that statement satisfies the first element of a claim for fraudulent inducement.

[27] As noted above, although Plaintiff's allegation here suggests that *Plaintiff* was the party that assigned the YOI Agreement to YOA, in fact Plaintiff did not actually assign the YOI Agreement to YOA," but rather merely "agreed to permit [YOI's] assignment" of the YOI Agreement to YOA based upon "YOI's representations." (Doc. No. 47 at ¶ 17). And as for the Assignment itself, it was entered into between *YOI* and *YOA* (and not also Plaintiff). (Doc. No. 25-2 at 4).

Statements were false (or, presumably, a false promise made without the present intent to carry out the promise) when these statements were made, because (according to Defendants) the Revised Complaint is lacking in factual allegations regarding "YOA's historical financial condition," (Doc. No. 16 at 8), and because (again according to Defendants) the Revised Complaint "makes no allegations (other than [a] conclusory one) about YOA in this regard." (*Id.*).[28] In response (Doc. No. 29 at 3-6), Plaintiff fails to identify any allegations to rebut Defendants' argument.

Here, the Court finds that Plaintiff's allegations are deficient with respect to the first element of fraudulent inducement—i.e., these allegations are deficient with respect to alleging that YOI made a false statement—and so Plaintiff has failed to state a claim for fraudulent inducement. The Court so finds because Plaintiff has not pled sufficient factual matter showing the At-Issue Statements when made either involved a "false statement[] of past or present facts or [a] false promise[] made without the present intent to [carry out the promise]." *Butler*, 2008 WL 5396019, at *7. Plaintiff does make conclusory allegations that YOA "has and had virtually no assets or revenue" and that "YOA lacked sufficient financial assets to complete [its contractual] obligations [to Plaintiff after the assignment of the YOI Agreement to YOA]." (Doc. No. 47 at ¶¶ 26, 28).[29] However, these conclusory allegations are not supported by any factual matter in the Revised Complaint making out that YOA lacked the financial resources to carry out its obligations under the Assignment (or any agreements thereto) when Sallee made the At-Issue Statements. In other

---

[28] Curiously, Defendants seem to make these arguments in connection with whether Plaintiff has adequately pled the second element of a claim for fraudulent inducement—that is whether Plaintiff has adequately pled that Sallee had knowledge of the At-Issue Statements' falsity or utter disregard for their truth. The Court discerns that these particular arguments are better suited to the first element of a fraudulent inducement claim and considers them accordingly.

[29] As the Court explained more fulsomely in a footnote above, the Court is constrained to treat the allegations here at issue as mere conclusory allegations.

words, Plaintiff has not plausibly alleged that the At-Issue Statements—and in particular the portion of the At-Issue Statements where Sallee stated that "[t]he only noticeable difference [after assignment to YOA] will be the check from [Plaintiff] will go to YOA instead of YOI" (Doc. No. 25-3)—were, when made, either false statements of present or past facts or otherwise were false promises made without a present intent to carry out those promises.

And—consistent with the Court's discussion above that, for a statement to satisfy the first element of a claim for fraudulent inducement, the statement must have been either factually false or a false promise when that statement was *made*—the fact that YOA was eventually unable to carry out its contractual obligations to Plaintiff (insofar as YOA terminated the YOA Agreement (Doc. No. 47 at ¶ 43)) does not suffice to show that the At-Issue Statements were, when made, either "false statements of past or present facts or false promises made without the present intent to [carry out the promises]" so as to satisfy the first element of a fraudulent inducement claim. *Butler*, 2008 WL 5396019, at *7.[30]

Accordingly, Plaintiff has failed to adequately allege the first element of a claim for fraudulent inducement, and so Count II of the Revised Complaint will be dismissed.[31]

---

[30] As an alternative to its theory that YOI made *affirmative false statements*, Plaintiff makes a cursory reference to a theory that YOI is culpable of *concealment or non-disclosure of facts*. That is, Plaintiff contends in passing that the first element of a claim for fraudulent inducement is satisfied by the *omission* in the At-Issue Statements of information regarding YOA's financial health or the differences between YOA's and YOI's capacities to carry out contractual obligations to Plaintiff. (Doc. No. 29 at 6-7). It is true that "[c]oncealment or non-disclosure of facts may also constitute fraud, if the party charged with fraud had knowledge of an existing fact or condition and a duty to disclose the fact or condition." *Robert J. Denley Co. v. Neal Smith Const. Co.*, No. W2006-00629-COA-R3CV, 2007 WL 1153121, at *6 (Tenn. Ct. App. Apr. 19, 2007). However, Plaintiff has also not made out the first element of a claim for fraudulent inducement through the (alleged) failure of YOI to disclose a material fact for a simple reason: consistent with the Court's observations herein, Plaintiff has not adequately alleged that there *was* a fact or condition— regarding either YOA's (allegedly) deleterious financial health or inability to perform in comparison to YOI—that actually could have been disclosed in the first place. So, this theory does not save Plaintiff's fraudulent inducement claim from dismissal.

[31] Given the dismissal of Plaintiff's claim of fraudulent inducement in Count II for failure to state a claim, the Court will not address Defendants' other arguments as to why Count II should be dismissed, namely

## 2. Count I: Breach of Contract

That takes the Court to Count I of the Revised Complaint, wherein, as noted above, Plaintiff alleges a claim for breach of contract against both YOI and YOA. (Doc. No. 47 at ¶¶ 37-46). As also noted above, although the Revised Complaint is unclear on this point, Plaintiff seems to assert in Count I that YOI breached the YOI Agreement—insofar as YOI breached the YOI Agreement by failing to carry out its contractual obligations to Plaintiff after the YOI Agreement was assigned

---

that (1) Plaintiff has not pled fraudulent inducement with the particularity required by Rule 9(b) (Doc. No. 16 at 6-7); (2) Count II is barred by the statute of limitations (*id.* at 9-15); and (3) Count II is duplicative of the breach of contract claim in Count I. (*Id.* at 15-18).

The Court will make some observations regarding the second argument, however. To the extent that Defendants argue that the breach of contract claim in Count I should be dismissed based on the statute of limitations because the "gravamen" of Count I is actually the claim for fraudulent inducement in Count II, which (according to Defendants) is subject to dismissal based on the statute of limitations, (Doc. No. 16 at 9-15), such an argument is unavailing.

Under Tennessee law the limitations period for fraudulent inducement claims is three years, Tenn. Code Ann. § 28-3-105; *Great Am. Ins. Co. v. Nelson, Inc.*, No. 216CV02283TLPCGC, 2018 WL 6037542, at *2 (W.D. Tenn. Nov. 16, 2018) (citing *Am. Fid. Fire Ins. Co. v. Tucker*, 671 S.W.2d 837, 841 (Tenn. Ct. App. 1983)), and the statute of limitations for breach of contract claims is six years. Tenn. Code Ann. § 28-3-109. The Tennessee Supreme Court has explained that in determining what limitations period applies to a particular claim, a court must ascertain the "gravamen" of that claim. *Benz-Elliott v. Barrett Enters.*, LP, 456 S.W.3d 140, 149 (Tenn. 2015). In determining the "gravamen" of a claim, a court analyzes two factors: (1) "the legal basis of the claim" and (2) "the type of injuries for which damages are sought." *Benz-Elliott*, 456 S.W.3d at 151. Here, even a cursory review of the Revised Complaint shows that the "gravamen" of the breach of contract claim in Count I is in fact (just as represented) a breach of contract (thus rendering applicable the six-year limitations period) and not fraudulent inducement. Indeed, the legal basis of Count I is plainly the alleged breaches of the YOI Agreement and the YOA Agreement, by YOI and YOA respectively, rather than any alleged fraudulent inducement of Plaintiff's consent to the assignment of the YOI Agreement to YOA. (Doc. No. 1 at ¶¶ 37-46). Moreover, the damages that Plaintiff seeks with respect to Count I are plainly damages for *breach of contract* inasmuch as they flow, at least in part, from the alleged breaches of the YOI Agreement and YOA Agreement. (Doc. No. 1 at ¶¶ 29-36 (detailing alleged damages from the alleged breaches of the YOI Agreement and the YOA Agreement), ¶ 46 (requesting compensatory damages in connection with Count I and noting that the YOI Agreement and YOA Agreement "provide for liquidated damages and attorney's fees.")). So, the "gravamen" of the claim in Count I is plainly a breach of contract. *See also Benz-Elliott*, 456 S.W.3d at 152 (noting that where damages "flowed directly from [a] breach of contract claim" the gravamen of the claim was breach of contract). Therefore, Count I is subject to the six-year limitations period applicable to breach of contract claims and thus is not even arguably barred by the statute of limitations (given that the alleged breaches of the YOI and YOA Agreements occurred in 2022 and that this action was commenced in 2025).

to YOA[32]—and that YOA breached the YOA Agreement when YOA terminated the YOA Agreement.

Defendants raise two arguments as to why Count I should be dismissed. In the memorandum in support of the First Motion to Dismiss, Defendants argue that the YOA Agreement is unenforceable because (according to Defendants) the YOA Agreement has unilateral and unrestricted termination provisions—namely Sections 5.2 and 5.3. (Doc. No. 16 at 18-24). So, the argument goes, the breach of contract claim—to the extent it is based on a breach of the YOA Agreement (and thus brought against YOA)—should be dismissed. In the Second Motion to Dismiss, YOI argues that Plaintiff *released* YOI from any obligations under the YOI Agreement. (Doc. No. 35 at 2). And so, the argument goes, Count I "should be dismissed with prejudice inasmuch as it articulates a claim for breach of contract against YOI." (*Id.* at 3). The Court will address each of these arguments in turn but will first briefly review the elements of a breach of contract claim under Tennessee state law.[33]

Under Tennessee state law, the elements of a breach of contract claim are: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of contract, and (3) damages caused by the breach of the contract." *Tennessee Homes v. Welch*, 664 S.W.3d 1, 8 (Tenn. Ct. App. 2022) (quoting *Fitness & Ready Meals LLC v. Eat Well Nashville LLC*, No.

---

[32] The crux of YOI's (alleged) breach of the YOI Agreement would seem to be rooted in Section 8.22 of the YOI Agreement, which, as noted above, provides that "[a]ny such assignment or transfer [of the YOI Agreement] shall not release [YOI] from its obligations [under the YOI Agreement]." (Doc. No. 25-1 at 14). (Doc. No. 25-1 at 14). In other words, even though the YOI Agreement had been assigned to YOA, and YOA had subsequently negotiated the YOA Agreement with Plaintiff, YOI would still be on the hook for its obligations under the YOI Agreement. Given that YOA subsequently (allegedly) failed to perform, YOI thus (allegedly) breached the YOI Agreement.

[33] As noted above, Tennessee state law is the substantive law that both parties agree governs the claims at issue in this action. Moreover, the YOI Agreement and the YOA Agreement each provide that they are governed by Tennessee law. (Doc. No. 25-1 at 15; Doc. No. 25-2 at 15).

M2021-00105-COA-R3-CV, 2022 WL 601073, at *3 (Tenn. Ct. App. Mar. 1, 2022)). As indicated in the preceding paragraph, the parties' dispute as to Plaintiff's breach of contract claim hinges on the first element of a claim for breach of contract and focuses specifically on whether the YOA Agreement is enforceable and on whether Plaintiff has released YOI from any obligations under the YOI Agreement.[34]

    a.  <u>Whether the YOA Agreement is Enforceable</u>

Turning to Defendants' argument as to the YOA Agreement's enforceability, Defendants argue that the YOA Agreement is unenforceable, because (according to Defendants) the YOA Agreement, in Sections 5.2 and 5.3 of that agreement, contains unilateral and unrestricted termination provisions (whereby Plaintiff could terminate the YOA Agreement). (Doc. No. 16 at 18-24). Put another way, according to Defendants, "a contract containing an unqualified unilateral right of termination – like the YOA Agreement – makes the contract an illusory promise and therefore void." (Doc. No. 16 at 21). Naturally, Plaintiff disagrees, arguing in response that the plain language of Sections 5.2 and 5.3 shows that Plaintiff's right to cancel the YOA Agreement was *not* unrestricted, and thus that the YOA Agreement *is* enforceable. (Doc. No. 29 at 12-13). Given this dispute, the Court will first review relevant contract law principles under Tennessee state law and then address the at-issue sections of the YOA Agreement.

As Defendants correctly identify, "Tennessee law provides that if one or both parties to a contract have the unrestricted right to cancel or terminate the agreement, then the contract lacks mutuality and is unenforceable." *Cont'l Motel Brokers, Inc. v. Blankenship*, 739 F.2d 226, 232 (6th Cir. 1984) (citing *Big Cola Corp. v. World Bottling Co. Ltd.,* 134 F.2d 718, 722 (6th Cir. 1943)); *Skinner v. Thomas Nelson, Inc.*, 1988 WL 99726, at *4 (Tenn. Ct. App. Sept. 28, 1988)

---

[34] Given that neither Defendant makes any argument as to whether the other two elements of a breach of contract claim have been adequately pled, the Court will not consider these elements herein.

("Plaintiff correctly states the law [in Tennessee] to be that if one of the parties has the unrestricted right to cancel or terminate the agreement, then the contract lacks mutuality and is unenforceable."). *Cf. Big Cola Corp.*, 134 F.3d at 722 ("Where an arbitrary and unrestricted right of cancellation is reserved to one or both parties in a contract . . . such contract is binding only to the extent that it has been performed.").

It is true that federal courts and Tennessee state courts interpreting and applying Tennessee state law sometimes refer to a "*unilateral*" right to terminate a contract as rendering a contract unenforceable, *see e.g., Stinger Industries, LLC v. Hill-Rom Co. Inc., Hill-Rom Medaes, Inc.*, 23 F. App'x 472, 475 (6th Cir. 2001) (noting that a "unilateral right to discontinue" performance under a contract rendered the contract unenforceable); *Horne v. Phillips*, No. E199900141COA-R3-CV, 2000 WL 224623, at *3 (Tenn. Ct. App. Feb. 28, 2000) (holding that a "unilateral right in Plaintiff to cancel the sale" rendered a contract unenforceable). However, it is clear from context that the mere fact that there is a "unilateral" right to terminate a contract—meaning, a right to terminate a contract that is enjoyed by only one party to the contract—does not render the contract unenforceable. Indeed, it is well-settled that "portions of a contract may apply to one party but not to others," and to which party any particular portion of a contract applies "has no bearing on the mutuality of parties' obligations as long as consideration exists and all parties are bound to honor the contract." *Dobbs v. Guenther*, 846 S.W.2d 270, 276 (Tenn. Ct. App. 1992).

The case law demonstrates that a right to terminate a contract renders a contract unenforceable not if that right is *unilateral*, but rather if that right is *unrestricted*. That is, if a right to terminate a contract is *unrestricted*, then it renders the contract unenforceable (regardless of whether such right is vested in one party, multiple but fewer than all parties, or all parties). *See e.g., Stinger Industries, LLC*, 23 F. App'x at 475 (noting, *inter alia,* that a contract with a unilateral

right to discontinue performance was unenforceable where that contract obligated a party to perform solely at that party's *discretion*); *Horne*, 2000 WL 224623, at *3 (discussing a contract with a "unilateral right in Plaintiff to cancel the sale" of a piece of land, and noting when finding the contract unenforceable that such right permitted plaintiff to cancel the sale "with no resulting consequences" and that plaintiff thus was not "bound to honor the contract"); *Cont'l Motel Brokers, Inc.*, 739 F.2d at 232 (observing that "Tennessee law provides that if *one or both parties* to a contract have the *unrestricted* right to cancel or terminate the agreement, then the contract lacks mutuality and is unenforceable" and that the contract at issue was not unenforceable, because it was not "terminable at will"); *In re Four Star Music Co., Inc.*, 2 B.R. 454, 460 (Bankr. M.D. Tenn.) ("[A] contract with an arbitrary right or option to cancel lacks mutuality and is unenforceable.").

In considering whether a contract is unenforceable due to an unrestricted right of termination, courts applying Tennessee law variously have considered relevant whether the contract affords a party the ability to cancel a contract "with no resulting consequences to [the cancelling party]," *Horne*, 2000 WL 224623 at *3, and whether under the terms of the contract a party was ultimately "never obligated to do anything" under the contract. *Id.* Courts also have considered whether the contract imposes "any limitation on the freedom of the alleged promisor[— to either terminate or perform under the contract]." *In re Four Star Music Co., Inc.*, 2 B.R. at 460.

The Court now turns to the at-issue provisions of the YOA Agreement, beginning by repeating these provisions (that is Section 5.2 and Section 5.3) in full. Section 5.2 of the YOA Agreement provided, with "METRO" referring to Plaintiff and "CONTRACTOR" referring to YOA:

**5.2. Lack of Funding**
Should funding for this Contract be discontinued, METRO shall have the right to terminate this Contract immediately upon written notice to CONTRACTOR.

(Doc. No. 25-2 at 4). Using "METRO" to refer to Plaintiff and "CONTRACTOR" to refer to YOA, Section 5.3 of the YOA Agreement provided:

**5.3. Notice**
METRO may terminate this Contract at any time upon thirty (30) days written notice to CONTRACTOR. Should METRO terminate this Contract, CONTRACTOR shall immediately cease work and deliver to METRO, within thirty (30) days, all completed or partially completed satisfactory work, and METRO shall determine and pay to CONTRACTOR the amount due for satisfactory work.

(Doc. No. 25-2 at 4).

The Court finds that these terms did not create an unrestricted right of termination so as to render the YOA Agreement unenforceable. As for Section 5.2, it certainly cannot be understood as having provided an *unrestricted* right to terminate a contract. Indeed, Plaintiff was permitted to cancel the YOA Agreement under Section 5.2 if (and *only* if) the funding for the YOA Agreement was discontinued. In other words, Section 5.2 neither rendered Plaintiff as having "never [been] obligated to do anything" under the YOA Agreement, *Horne*, 2000 WL 224623 at *3, nor failed to "put any limitation on the freedom of [Plaintiff—to either terminate or perform under the contract]." *In re Four Star Music Co., Inc.*, 2 B.R. at 460. For these reasons, Section 5.2 did not render the YOA Agreement unenforceable.

As for Section 5.3, although it provided that Plaintiff may terminate the YOA Agreement "at any time," (Doc. No. 25-2 at 4), it did not provide for an *unrestricted* right of termination. Section 5.3 provided restrictions on this termination right, even if the right could be exercised "any time" that those restrictions were inapplicable (or complied with, or properly observed). First, Plaintiff was required to provide thirty days' written notice to YOA if it elected to terminate the

YOA Agreement under Section 5.3. (*Id.*). And second, Plaintiff was required under Section 5.3 to "determine and pay to" YOA "the amount due for satisfactory work" after the termination of the YOA Agreement. (*Id.*). Put another way, even if Section 5.3 did permit Plaintiff to terminate the YOA Agreement "any time" consistent with applicable restrictions (of which there indeed were some), Section 5.3 neither permitted the termination of the YOA Agreement to take place "with no resulting consequences to [Plaintiff]," *Horne*, 2000 WL 224623 at *3,[35] nor failed to put a "limitation on the freedom of [Plaintiff—to either terminate or perform under the contract]." *In re Four Star Music Co., Inc.*, 2 B.R. at 460.[36] So, the Court finds that Section 5.3 did not render the YOA Agreement unenforceable.[37]

Given these findings, the Court declines to dismiss the breach of contract claim in Count I against YOA based on the purported unenforceability of the YOA Agreement.

   b.  <u>Whether Plaintiff Released YOI from its Obligations under the YOI Agreement</u>

That leaves the sole argument raised by YOI in the Second Motion to Dismiss, namely that the Court should dismiss any "breach of contract claim against YOI" because (according to YOI)

---

[35] Indeed, the Court can readily ascertain one possible consequence that Plaintiff could suffer upon Plaintiff giving thirty days' written notice to YOA of Plaintiff's decision to terminate the YOA Agreement. Specifically, Section 5.3 did not foreclose YOA continuing to perform under the YOA Agreement after written notice of termination had been given by Plaintiff (although the agreement did foreclose continued performance by YOA upon the *actual termination* of the agreement), thereby permitting YOA to create an ongoing and increasing payment obligation for Plaintiff in the period between Plaintiff giving notice of the agreement's termination and the agreement's actual termination—an obligation that Plaintiff presumably would have preferred to avoid after it elected to give notice of the termination of the YOA Agreement.

[36] Likewise, Section 5.3 does put a restriction on Plaintiff's prerogative to terminate the contract—namely, a requirement that Plaintiff both give YOA thirty days written notice prior to terminating the contract and pay YOA for the amount due for satisfactory work done under the YOA Agreement.

[37] To the extent that Defendants contend that the YOA Agreement is unenforceable because Defendants were not given a similar right to terminate the YOA Agreement as that provided to Plaintiff in Section 5.2 and Section 5.3, (Doc. No. 16 at 19, 19 n.9, 21-22), such an argument is unavailing, consistent with the Court's discussion above to the effect that a mere *unilateral* termination provision is insufficient to render a contract unenforceable.

"YOI has, in fact, been released by [Plaintiff] from any further obligations" under the YOI Agreement. (Doc. No. 35 at 2). The (entire) basis of this argument—the alleged fact, if indeed it is a fact rather than a legal conclusion—is found not in any particular allegations in the Revised Complaint, but rather in the filing at Docket No. 25-4. The filing includes, in addition to the Assignment (Doc. No. 25-4 at 2), a document titled, "Letter of Assignment Consent for Contract No. 6485978" (Doc. No. 25-4 at 1, "Letter of Assignment"), which was sent from Plaintiff to YOA. The Letter of Assignment provided, in relevant part:

> [Plaintiff] has completed the review of the assignment request related to [the YOI Contract] dated March 3, 2021. The original contract holder, [YOI], agrees to assign the [YOI Agreement] to the newly named entity, [YOA]. [Plaintiff] agrees to continue the contract under the new entity. The terms and conditions associated to the [YOI Agreement] will be transferred to the new contract[, the YOA Agreement]. Upon execution of the [Letter of Assignment], [Plaintiff] will finalize [the YOA Agreement] for signature routing. [The YOA Agreement] will become effective upon filing in the Metropolitan Clerk's Office. [The YOI Agreement] will no longer be active and will end upon filing of [the YOA Agreement] in the Metropolitan Clerk's Office.

(Doc. No. 25-4 at 1). According to YOI, the Letter of Assignment shows that Plaintiff released YOI from its obligations under the YOI Agreement, because of the language in the Letter of Assignment providing that "[The YOI Agreement] will no longer be active and will end upon filing of [the YOA Agreement] in the Metropolitan Clerk's Office." (Doc. No. 25-4 at 1).

Simply put, the Court declines to consider the argument raised in the Second Motion to Dismiss, because the Court cannot consider the basis for that argument—the Letter of Assignment (as opposed to the Assignment itself)—without converting the Second Motion to Dismiss into a motion for summary judgment.

As the Court explained earlier, "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity

to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). However, there is an exception to this Rule: "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Revised Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett*, 528 F.3d at 430.

It is true that the Court has concluded (in a footnote above) that is can consider certain documents referred to in the Revised Complaint, namely the YOI Agreement, the YOA Agreement, the Sallee Email, the Termination, and the *Assignment* (not to say the *Letter of Assignment*) in evaluating the Motions, because these documents "are referred to in the [Revised] Complaint and are central to the claims contained therein." *Bassett*, 528 F.3d at 430. However, the Letter of Assignment is *not* referred to in the Revised Complaint. Although Plaintiff makes allegations that refer to the *Assignment* (Doc. No. 47 at ¶¶ 17, 18), Plaintiff does not mention the Letter of Assignment even once in the Revised Complaint (although the Court acknowledges both that Plaintiff does allege that it "agreed to permit the assignment" of the YOI Agreement to YOA based upon "YOI's representations," (Doc. No. 47 at ¶ 17), and that the Letter of Assignment seems to memorialize Plaintiff agreeing to permit the assignment of the YOI Agreement to YOA). Given this reality, the Court cannot consider the Letter of Assignment without converting the Second Motion to Dismiss into a motion for summary judgment. *See* Fed. Rule of Civ. P. 12(d).

And rather than converting the Second Motion to Dismiss into a motion for summary judgment, the Court finds that the better path, given the early stage of this litigation and the still ongoing discovery in this action (Doc. No. 49), is to deny the Second Motion to Dismiss. *See e.g., Burns v. Borough of Doylestown*, No. CV 24-2690, 2025 WL 2845362, at *3 (E.D. Pa. Oct. 7,

2025) ("Rather than converting the motion into one for summary judgment, the Court declines to dismiss on [the grounds asserted in the motion]."); *Young v. Lopez*, No. 22-C-1519, 2023 WL 6295393, at *1 (E.D. Wis. Sept. 27, 2023) ("Rather than convert the motion to dismiss into one for summary judgment, the better practice would be to deny the motion as premature."). Such denial is without prejudice to YOI raising in a motion for summary judgment the argument that the Court should dismiss any "breach of contract claim against YOI" because (according to YOI) "YOI has, in fact, been released by [Plaintiff] from any further obligations" under the YOI Agreement. (Doc. No. 35 at 2).

<u>CONCLUSION</u>

Accordingly, the First Motion to Dismiss (Doc. No. 15) will be **GRANTED** in part and **DENIED** in part. The First Motion to Dismiss will be **GRANTED** to the extent that it seeks dismissal of Plaintiff's fraudulent inducement claim (Count II). The First Motion to Dismiss will be **DENIED** in all other respects. The Second Motion to Dismiss (Doc. No. 35) will be **DENIED** in its entirety. Accordingly, Count II of this action will be **DISMISSED** and this action will proceed solely with respect to Count I.

An appropriate corresponding order will be entered.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE